William B. Federman
(admitted *pro hac vice*)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
wbf@federmanlaw.com

*Attorneys For Plaintiffs*

*(Additional Counsel Listed on Signature Page)*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT HOGSED, JUSTIN KNOX, FLOR MEDINA, BRENDA ALLEN, and KATHERINE WITKOWSKI, on behalf of themselves and others similarly situated,<br><br>            Plaintiffs,<br><br>      vs.<br><br>PRACTICEMAX, INC., a Delaware corporation,<br><br>            Defendant. | No. 2:22-cv-01261-DLR<br><br><br><br><br>*Judge Douglas L. Rayes* |

## PLAINTIFFS' UNOPPOSED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT

Plaintiffs Robert Hogsed, Justin Knox, Flor Medina, Brenda Allen, and Katherine Witkowski (collectively, "Plaintiffs" or "Class Representatives") submit this Motion and Memorandum in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement.

## I.    INTRODUCTION

On October 26, 2023, the Court granted preliminary approval of the Settlement between Plaintiffs and Defendant PracticeMax, Inc. ("PracticeMax" or "Defendant"), and ordered that notice be given to the Class. ECF No. 40. The Settlement provides up to $3,000,000.00 in substantial and immediate benefits to the Settlement Class.

Under the Settlement, all Class Members are eligible to receive cash payments, including payments for lost time at a rate of $25 per hour up to three (3) hours, compensation for ordinary out-of-pocket losses up to $500, and compensation for extraordinary out-of-pocket losses up to $3,500 per Settlement Class Member. ECF No. 39, Exhibit 1 to Settlement Agreement ("S.A."), ¶ 3.1. In addition to the monetary recovery, Defendant also agreed to provide Class Members with two years of credit monitoring and identity theft protection services, including $1 million in insurance. S.A., ¶ 3.2. As this type of credit monitoring protection typically has a retail price of at least $10 per month ($240.00 for two years), and all Settlement Class Members are eligible to receive this benefit, the retail value of this benefit obtained for the Class is significant. Finally, Plaintiffs and Class Members have and will continue to receive a benefit from substantial business practice changes and remedial measures aimed at preventing further unauthorized access to their sensitive Private Information entrusted to PracticeMax.

The Parties reached this Settlement—providing meaningful benefits for the Settlement Class—only after an extensive investigation, hard-fought litigation, and arm's-length negotiations. Although Plaintiffs believe in the merits of their claims, Defendant denies each and all of the claims and contentions alleged against it in the Litigation, including all charges of wrongdoing or liability. The claims involve the intricacies of data security litigation (a fast-developing area in the law), and the Plaintiffs would face risks at each stage

of litigation. Against these risks, Class Counsel and the Class Representatives believe that the Settlement achieved is for the benefit of the Settlement Class.

After this Court granted preliminary approval, the Settlement Administrator—with the help of the Parties—disseminated Notice to the Settlement Class as set forth in the Settlement Agreement. Individual Notice was provided directly to Settlement Class Members via first class mail. Class Notice reached 93.1% of the Class, easily meeting the due process standard. *See* Declaration of Cameron R. Azari ("Azari Decl."), Exhibit 1 to Declaration of William B. Federman ("Federman Decl."), attached hereto, ¶ 28. The Notice was written in plain language, providing each Settlement Class Member with information regarding how to reach the Settlement Website, make a claim, and how to opt-out or object to the Settlement. *Id.* at Attachments 3 and 4. Out of 336,043 Settlement Class Members who received a Postcard Notice,[1] only eight have successfully sought to be excluded from the Settlement, and only two have objected. Azari Decl., ¶ 32.

Plaintiffs now move the Court for final approval. The Settlement meets all the criteria for final approval. Plaintiffs respectfully submit that the Court should grant final approval and also grant the Plaintiffs' request for attorneys' fees, expenses and service awards.

## II.    INCORPORATION BY REFERENCE

In the interest of judicial efficiency, for factual and procedural background on this case, Plaintiffs refer this Court to and hereby incorporate Plaintiffs' Motion and Memorandum of Law in Support of Request for Attorneys' Fees, Expenses, and Service Awards, filed on January 11, 2024. ECF No. 42 at 2-4.

## III.    SUMMARY OF THE SETTLEMENT

The Settlement will provide relief for the following Settlement Class: "All persons residing in the United States to whom PracticeMax sent its notice of a Data Security Incident

---

[1] Direct notice was sent to all 360,781 Settlement Class members. Azari Decl., ¶ 24. Some notices were returned as undeliverable, and Epiq re-mailed 30,101 notices to updated addresses, to the extent they were available. Azari Decl., ¶ 26.

that PracticeMax discovered on or about May 1, 2021." S.A., ¶ 1.36. The Settlement Class contains approximately 360,781 individuals.[2]

Settlement Class Members shall have the opportunity to submit a Claim for Settlement benefits on or before the Claims Deadline. The benefits available to Settlement Class Members, as described below, shall include: (1) compensation for ordinary losses, (2) compensation for lost time; (3) compensation for extraordinary losses; and (4) credit monitoring services.

Ordinary Loss Claims: Settlement Class Members may submit a Claim for reimbursement of documented out-of-pocket losses incurred as a result of the Data Security Incident, up to a maximum of $500 per person. Such Ordinary Loss Claims will reimburse Class Members for expenses such as: (i) bank fees, long distance phone charges, cell phone charges (only if charged by the minute), data charges (only if charged based on the amount of data used), postage, or gasoline for local travel; (ii) fees for credit reports, credit monitoring, or other identity theft insurance product purchased between May 1, 2021, and the date of the Settlement Agreement; and (iii) other expenses fairly traceable to the Data Security Incident.  S.A., ¶ 3.1(a).

Lost Time Claims: Settlement Class Members may also submit a Claim for reimbursement for time they spent addressing the Data Security Incident or its impacts. Class members may submit claims for up to three (3) hours of lost time, to be compensated at a rate of $25 per hour, with a simple attestation that they spent the claimed time responding to issues raised by the Data Security Incident. This payment shall be included in the per person cap for Compensation for Ordinary Losses. *Id.*

Extraordinary Loss Claims: Settlement Class Members who were the actual victim of identity theft may also make a claim for up to $3,500 in proven monetary loss if: (i) the loss

---

[2] The Motion for Preliminary Approval (ECF No. 39), filed on October 23, 2023, incorrectly identified the Class as consisting of 154,929. This was based on the number of affected individuals that PracticeMax provided to the Maine Attorney General. Further investigation from PracticeMax revealed that the actual number of affected individuals was larger.

is an actual, documented, and unreimbursed monetary loss; (ii) the loss was more likely than not caused by the Data Security Incident; (iii) the loss occurred between May 1, 2021, and the date of the Settlement Agreement; (iv) the loss is not already covered by one or more of the normal reimbursement categories; and (v) the Settlement Class Member made reasonable efforts to avoid, or seek reimbursement for, the loss, including but not limited to exhaustion of all available credit monitoring insurance and identity theft insurance. *Id.,* ¶ 3.1(b).

Credit Monitoring Services: Settlement Class Members will also be offered an opportunity to enroll in two (2) years of single bureau credit monitoring and identity theft protection with $1 million in insurance to cover the costs of any future identity theft. *Id.,* ¶ 3.2.

In addition to the foregoing benefits, all Settlement Class Members will benefit from substantial business practice changes and remedial measures aimed at preventing further unauthorized access to their sensitive Private Information entrusted to PracticeMax. *Id.* ¶ 3.3.

Pursuant to the Settlement, PracticeMax will additionally pay for the costs of class notice and settlement administration. PracticeMax will further pay for attorneys' fees and reimbursement of litigation expenses as well as service awards to Plaintiffs, as approved by the Court. The total costs owed by PracticeMax under the Settlement, including notice and settlement administration costs, attorneys' fees and expenses as approved by the Court, and any service awards approved by the court, may not exceed $3,000,000.00. *Id.,* ¶ 3.9. The costs of PracticeMax's remedial security measures are separate and excluded from this cap.

## IV.    LEGAL STANDARD

Plaintiffs bring this motion pursuant to Federal Rules of Civil Procedure Rule 23(e), under which a class action may not be settled without approval of the Court. In determining whether to finally approve a class action settlement, courts must first determine that the settlement class, as defined by the parties, is certifiable under the standards of Rule 23(a) and (b). This Court has considered and granted preliminary approval of class certification. ECF No. 40. For the same reasons described in Plaintiffs' Unopposed Motion for Preliminary

Approval of Settlement (ECF No. 39), this Court should certify the class for purposes of final approval of the settlement.

Next, for a settlement to be approved under Rule 23(e)(2), the Court must determine, after holding a hearing, that it is fair, adequate, and reasonable. In making this determination, the Court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. Rule 23(e)(2).

In addition to the Rule 23(e)(2) factors, courts in the Ninth Circuit look to nine factors in making this determination: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the settlement is a product of collusion among the parties. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

## V.    ARGUMENT

Federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters where the inherent costs, delays, and risks of continued litigation

might otherwise overwhelm any potential benefit the class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); 4 NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) (citing cases). Here, with a strong settlement that enjoys robust support from the Settlement Class, and to which there is no opposition, the Court should grant final approval to this settlement.

**A.    The Settlement Satisfies All the Rule 23(e)(2) Factors**

**1.  The Class Was Adequately Represented**

"[T]he adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 567 (E.D. Va. 2016) (citation omitted). Here, the Class Representatives have the same interests as all other Settlement Class Members as they are asserting the same claims and share the same injuries. Further, the Court has already recognized Class Counsel's experience and qualifications in appointing them to lead this litigation and the record shows Class Counsel worked diligently to litigate and ultimately bring this case to resolution. *See* Order Granting Preliminary Approval, ECF No. 40; *see also In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 952 F.3d 471, 485 (4th Cir. 2020) (finding counsel's experience in complex civil litigation supported fairness of settlement).

**2.  The Settlement was Negotiated at Arm's Length**

The negotiations in this matter occurred at arm's length. *See* Federman Decl., ¶¶ 3, 5. Settlements negotiated by experienced counsel that result from arm's-length negotiations are presumed to be fair, adequate and reasonable. *See Leonardo's Pizza by the Slice, Inc. v. Wal–Mart Stores, Inc.*, 544 U.S. 1044, 125 S. Ct. 2277, 161 L.Ed.2d 1080 (2005) (a "'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-

length negotiations between experienced, capable counsel after meaningful discovery.'" (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42 (1995))).

This deference reflects the understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness consideration of Rule 23(e).

### 3.  The Relief is Adequate Under Rule 23(e)(2)(C)

The relief offered to Class Members in the proposed Settlement addresses the types of repercussions and injuries arising from the Data Incident and is more than adequate under the factors outlined in Rule 23(e)(2)(C).

Class Counsel, who have meaningful experience in leading major data breach class actions, strongly believe that the relief is fair, reasonable, and adequate. The Court may rely upon such experienced counsel's judgment. *See, e.g.*, *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.") (citations omitted).

### i.  The Costs, Risk, And Delay of Trial and Appeal

As outlined in the preliminary approval motion and motion for attorneys' fees, Plaintiffs faced significant risks and costs should they have continued to litigate the case. First, there was a risk that Plaintiffs' claims would not have survived, or survived in full, on a class-wide basis after a motion for class certification, motions for summary judgment, and Daubert motions on damages methodologies, among other motions. Second, if Plaintiffs prevailed on a motion for class certification, successfully defeated all the other objections and motions Defendant filed, and proceeded to trial, Plaintiffs still would have faced significant risk, cost, and delay including likely interlocutory and post-judgment appeals.

In contrast to the risk, cost, and delay posed by proceeding to trial, the proposed Settlement provides certain, substantial, and immediate relief to the proposed Settlement Class. It ensures that Settlement Class Members with valid claims for Out-of-Pocket Losses

or Lost Time will receive guaranteed compensation now and provides Settlement Class Members with access to credit monitoring and identity theft protection services (benefits that may not have been available at trial). The substantial costs, risk, and delay of a trial and appeal support a finding that the proposed Settlement is adequate.

### ii. The Method of Distributing Relief Is Effective

The proposed distribution process will be efficient and effective. The available relief is detailed clearly in the Notice, which was provided to all Settlement Class Members laying out the benefits to which they are entitled, including benefits provided regardless of whether a Settlement Class Member files a claim. Azari Decl., ¶ 27.

Noticing the Settlement Class of the available relief was efficient and effective. Notice included dissemination of individual notice by direct mail, in the form of the Short Form postcard notice. This direct mail notice reached 93.1% of the Class. *Id.,* ¶ 28. Therefore, Settlement Class Members received effective and efficient notice of the relief offered. Because Settlement Class Members were able to make claims through a simple online form or by mail, the method of distributing the relief was both efficient and effective, and the proposed Settlement is adequate under this factor.

### iii. The Terms Relating to Attorneys' Fees Are Reasonable

Class Counsel has requested, and PracticeMax has agreed not to object to Class Counsel's request for $825,000 in a combined award of attorneys' fees and reimbursement for litigation expenses. This request is on par with awards routinely granted by courts in the Ninth Circuit and is supported by a lodestar crosscheck, as laid out in the previously filed amended attorneys' fee motion. ECF No. 42. This factor supports approval of the proposed Settlement.

### iv. Any Agreement Required To Be Identified Under Rule 23(e)(3)

Apart from the Settlement Agreement, there are no additional agreements between the Parties or with others made in connection with the Settlement. Accordingly, this factor weighs in favor of final approval of the Settlement.

1          **4.  The Proposed Settlement Treats Class Members Equitably.**

2          The Settlement Class Members are treated equitably because they all have similar

3    claims arising from the same data breach, and they all are treated the same under the

4    Settlement. Fed. R. Civ. P. 23(e)(2)(D). All Settlement Class Members are eligible to claim

5    the various benefits provided by the Settlement, including compensation for Out-of-Pocket

6    Losses, compensation for time spent responding to the Data Incident, and two years of

7    identity protection services.

8          Accordingly, the factors under Rule 23(e) support final approval. As discussed below,

9    the *Bluetooth* factors are similarly satisfied.

10   **B.    The Settlement Satisfies All of the *Bluetooth* Factors**

11          **1.    The Strength of Plaintiffs' Case**

12          Plaintiffs believe they have a strong case for liability. As described in Plaintiffs' motion

13   for preliminary approval, Plaintiffs believe their claims are viable and that they have a

14   reasonably good chance of proving that PracticeMax's data security was inadequate, which

15   could lend itself to a finding that Defendant was liable under at least some of the theories

16   Plaintiffs pled in their complaint. While Plaintiffs believe they have strong claims and would

17   be able to prevail, their success is not guaranteed. It is "plainly reasonable for the parties at

18   this stage to agree that the actual recovery realized and risks avoided here outweigh the

19   opportunity to pursue potentially more favorable results through full adjudication." *Dennis v.*

20   *Kellogg Co.*, No. 09-cv-1786-L(WMc), 2013 WL 6055326, at *3 (S.D. Cal. Nov. 14, 2013).

21   "Here, as with most class actions, there was risk to both sides in continuing towards trial. The

22   settlement avoids uncertainty for all parties involved." *Chester v. TJX Cos.*, No. 5:15-cv-01437-

23   ODW(DTB), 2017 WL 6205788, at *6 (C.D. Cal. Dec. 5, 2017). However, given the heavy

24   obstacles and inherent risks Plaintiffs face with respect to the novel claims in data breach class

25   actions, including class certification, summary judgment, and trial, the substantial benefits the

26   Settlement provides favors final approval of the settlement. *Id.*

27

28

### 2. The Risk, Expense, Complexity, and Duration of Further Litigation

Although Plaintiffs believe their case has merit, they recognize that all cases are subject to substantial risk. This case involves: a proposed class of approximately roughly 360,781 individuals (each of whom, PracticeMax has argued, would need to establish cognizable harm and causation); a complicated and technical factual background; and an aggressive and motivated Defendant that already has provided some relief to the potentially affected individuals.

Although nearly all class actions involve a high level of risk, expense, and complexity—undergirding the strong judicial policy favoring amicable resolutions, *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)—this is an especially complex class in an especially risky arena. As one federal district court recently observed in finally approving a settlement with similar class relief:

> Data breach litigation is evolving; there is no guarantee of the ultimate result. *See Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases ... are particularly risky, expensive, and complex.").

*Fox v. Iowa Health Sys.*, No. 3:18-CV-00327-JDP, 2021 WL 826741, at *5 (W.D. Wis. Mar. 4, 2021). Data breach cases face substantial hurdles in surviving even the pleading stage. *See, e.g., Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060 (RMB) (RLE), 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting cases). Even cases of similar notoriety and implicating data far more sensitive than at issue here have been found wanting at the district court level. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 19 (D.D.C. 2017) ("The Court is not persuaded that the factual allegations in the complaints are sufficient to establish . . . standing."), *rev'd in part*, 928 F.3d 42 (D.C. Cir. 2019) (holding that plaintiff had standing to bring a data breach lawsuit).

To the extent the law has gradually accepted this relatively new type of litigation, the path to a class-wide monetary judgment remains unforged, particularly in the area of damages.

For now, data breach cases are among the riskiest and most uncertain of all class action litigation, making settlement the more prudent course when a reasonable one can be reached. The damages methodologies, while theoretically sound in Plaintiffs' view, remain untested in a disputed class certification setting and unproven in front of a jury. And as in any data breach case, establishing causation on a class-wide basis is rife with uncertainty.

Each risk, by itself, could impede the successful prosecution of these claims at trial and in an eventual appeal—which would result in zero recovery to the class. "Regardless of the risk, litigation is always expensive, and both sides would bear those costs if the litigation continued." *Paz v. AG Adriano Goldschmeid, Inc.*, No. 14CV1372DMS(DHB), 2016 WL 4427439, at *5 (S.D. Cal. Feb. 29, 2016). Thus, this factor favors final approval.

### 3.     The Risk of Maintaining Class Action Status Through Trial

While Plaintiffs' case is still in the pleadings stage, the Court has not certified any class treatment of this case. Absent settlement, class certification in consumer data breach cases has only occurred in a few cases. *See, e.g., Smith v. Triad of Ala.*, LLC, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *15 (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017). Even when certification is granted, there are appeals. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 890 (11th Cir. 2023) (vacating class certification in part and remanding for addition analysis on the predominance element). While certification of additional consumer data breach classes may follow, the dearth of precedent adds to the risks posed by continued litigation.

### 4.     The Amount Offered in Settlement

In light of the substantial risks and uncertainties presented by data security litigation generally and this litigation specifically (as evidenced by the motions' practice in this case), the value of the Settlement strongly favors approval. The Settlement makes significant relief available to Settlement Class Members, in the form of out-of-pocket expense reimbursements, compensation for lost time, and credit monitoring and identity theft protection services.

The Settlement Agreement's benefits set out above are tailored to address the fundamental concerns raised in the Action, providing meaningful relief up to $3 million. The per Class Member benefits are substantial, providing up to $75 in lost time reimbursement, reimbursement of ordinary and extraordinary losses up to $3,500, and two years of credit monitoring and identity theft protection services. This settlement is a strong result for the Class and exceeds or is in line with other settlements in cases involving data breaches of similar scope.[3]

This settlement is a strong result for the Class, and as discussed herein is in line with other approved settlements in cases involving data incidents of similar scope. *See Calderon v. Wolf Firm*, No. SACV 16-1622-JLS(KESx), 2018 WL 6843723, at *7-8 (C.D. Cal. Mar. 13, 2018) (comparing class settlement with other settlements in similar cases). In light of the difficulties and expenses Class Members would face pursuing individual claims, and the

---

[3] *See, e.g., Fehlen v. Accellion, Inc.*, Case No. 21-cv-01353 (N.D. Cal.) (settlement of $8.1 million for 9.2 million class members who had their Social Security Numbers compromised; $0.90 per class member); *Dickey's Barbeque Restaurants, Inc.*, Case No. 20-cv-3424 (N.D. Tex.), Dkt. 62 (data breach class action involving more than 3 million people that settled for $2.3 million, or $0.76 per person); *In re: Capital One Consumer Data Breach Litigation*, MDL No. 1:19md2915 (AJT/JFA) ECF No. 2251 (Memo in Support of Final Approval), page 1 ($190 million common fund settlement for a class of approximately 98 million, or $1.93 per person); *Cochran v. Accellion, Inc., et al.*, No. 5:21-cv-01887-EJD (N.D. Cal.), ECF No. 32 (June 30, 2021) ($5 million settlement fund for 3.82 million class members or approximately $1.31 per Class member); *Adlouni v. UCLA Health Systems Auxiliary, et al.*, No. BC 589243 (Cal. Super. Ct. June 28, 2019) ($2 million settlement in medical information data breach for approximately 4,500,000 Class Members; 44 cents per Class Member); *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617 (N.D. Cal. Aug. 15, 2018) ($115 million settlement in medical information data breach for 79,200,000 Class Members; $1.45 per Class Member); *In re The Home Depot, Inc. Customer Data Sec. Breach Litig.*, No. 1:14-MD02583, 2016 WL 6902351, at *7 (N.D. Ga. Aug. 23, 2016) and ECF No. 181-2 ¶¶ 22, 38 ($13 million settlement for approximately 40 million class members; 32.5 cents per Class Member); *In re Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522, 2017 WL 2178306, at **1- 2 (D. Minn. May 17, 2017) ($10 million settlement for nearly 100 million Class Members; 10 cents per Class Member); *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 582 (N.D. Cal. 2015) ($1.25 million settlement for approximately 6.4 million Class Members; 20 cents per Class Member).

likelihood that they might be unaware of their claims, this Settlement Amount is appropriate. *See id.* Accordingly, this factor favors approval.

### 5. The Extent of Discovery Completed and the Stage of Proceedings

Plaintiffs vigorously and aggressively gathered all of the information that was available regarding PracticeMax and the Data Incident—including publicly-available documents concerning announcements of the Data Incident and notice of the Data Incident to its customers. The parties also informally exchanged non-public information concerning the Data Incident and the size of the Class in preparation for mediation. Further, the parties exchanged detailed mediation statements and engaged in candid mediation discussions facilitated by JAMS mediator Bruce Friedman. Accordingly, the litigation has proceeded to the point where "the parties have sufficient information to make an informed decision about settlement," including an informed and realistic assessment of the strengths and weakness of their respective cases. *See Linney*, 151 F.3d at 1239.

### 6. The Experience and Views of Counsel

Class Counsel initiated this lawsuit when PracticeMax announced the Data Incident, which, based upon publicly-available information, potentially impacted many thousands of individuals. Class Counsel have substantial experience litigating complex class cases of various types, including data-related cases such as this one. *See* Federman Decl. ¶ 9; *see also* ECF No. 39, Exhibit 2 (resumes of Class Counsel). Having worked on behalf of the putative class since the Data Incident was first announced, evaluated the legal and factual disputes, and dedicated significant time and monetary resources to this litigation, proposed Class Counsel fully endorse the Settlement. A great deal of weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. *See, e.g.*, *Norton*, 2017 WL 1424636, at *6; *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004). Thus, this factor supports approval.

1          **7.      Governmental Participants**

2          There is no governmental participant in this matter. However, CAFA notice was timely

3     provided to all states' attorneys general, and there was no response. See Azari Decl., ¶ 20.

4          **8.      The Positive Reaction of the Class Favors Final Approval**

5          The reaction of the Settlement Class to this Settlement is overwhelmingly positive. The

6     deadline to object or opt out of the settlement was January 25, 2024. Out of a total of 336,043

7     Class Members who received direct notice, only 10 Class Members sought exclusion with two

8     of those requests being incomplete, reducing the opt-out total to eight. *See* Azari Decl., ¶ 32.

9     In addition, of the 336,043 Class Members who received direct notice, only two submitted

10    letters objecting to the Settlement. *Id.*[4] In contrast, as of February 7, 2024, the Settlement

11    Administrator received 4,636 Claim Forms (4,430 online and 206 paper). *Id.,* ¶ 34.

12         "It is established that the absence of a large number of objections to a proposed class

13    action settlement raises a strong presumption that the terms of a proposed class settlement

14    action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221

15    F.R.D. 523, 529 (C.D. Cal. 2004); 4 NEWBERG ON CLASS ACTIONS § 11:48 ("Courts have

16    taken the position that one indication of the fairness of a settlement is the lack of or small

17    number of objections [citations omitted]"). The fact that only one member, representing

18    _____

19    [4] Two Class Members submitted letters to the Settlement Administrator purporting to object
      to the Settlement. *See* Azari Decl. at Attachment 7. Because the letters were not filed with the
20    Court, neither Class Member of the letters complied with the objector obligations under the
      Settlement. *See, e.g., Chavez v. PVH Corp.*, No. 13-CV-01797-LHK, 2015 WL 9258144, at *3
21    (N.D. Cal. Dec. 18, 2015) (explaining that court may reject "procedurally improper" objections
      on that basis alone); *Moore v. Verizon Comm'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at
22    *12 (N.D. Cal. Aug. 28, 2013) (overruling objections that were submitted because these
      objections "fail[ed] to comply with the procedural requirements for objecting to the
23    Settlement"). Procedural failures aside, the two objections do not provide sufficient grounds
24    for denying the otherwise well received Settlement. *See Browning v. Yahoo! Inc.*, No. C04-01463
      HRL, 2007 WL 4105971, at *8 (N.D. Cal. Nov. 16, 2007) (overruling objections to settlement,
25    finding that they gave "scant, if any, recognition to the significant hurdles faced by the Plaintiff
26    and the class on the merits …, or on the risk, expense, complexity and likely duration of further
      litigation."). And, in any event, both objections should be overruled given that this Settlement
27    is fair, reasonable, and adequate for the reasons discussed herein.

28

1    0.00027% of the Class, has submitted an objection reflects a highly positive response by the

2    Settlement Class. *See, e.g.*, *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC,

3    2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (finding that only one objector to

4    settlement and fee request represented an "overwhelmingly positive" response from the class

5    of 24,358 members); *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act*

6    *(FACTA) Litig.*, 295 F.R.D. 438, 456 (C.D. Cal. 2014) ("The negligible number of opt-outs

7    and objections indicates that the class generally approves of the settlement.").

8                          **9.  Lack of Collusion Among the Parties**

9         The parties negotiated a substantial, multifaceted Settlement, as described above. Class

10   Counsel and PracticeMax's counsel are well-versed in handling data-related class actions such

11   as this one and fully understand the values recovered in similar cases. The assistance of a

12   respected third-party mediator also is evidence of no collusion. Federman Decl., ¶ 5.

13   Therefore, the Court can be assured that the negotiations were not collusive. *See G. F. v. Contra*

14   *Costa Cnty.*, No. 13-CV-03667-MEJ, 2015 WL 7571789, at *11 (N.D. Cal. Nov. 25, 2015)

15   (working with neutral mediators is "a factor weighing in favor of a finding of non-

16   collusiveness") (internal quotation marks and citation omitted).

17        **VI.    NOTICE SATISFIED DUE PROCESS AND RULE 23**

18        To satisfy due process, notice to class members must be the best practicable, and

19   reasonably calculated under all the circumstances to apprise interested parties of the pendency

20   of the action and afford them an opportunity to present their objections. Fed. R. Civ. P. 23(e);

21   *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). Notice provided to the class must be

22   sufficient to allow class members "a full and fair opportunity to consider the proposed decree

23   and develop a response." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

24   While individual notice should be provided where class members can be located and identified

25   through reasonable effort, notice may also be provided by U.S. Mail, electronic mail or other

26   appropriate means. Fed. R. Civ. P. 23(c)(2)(B).

27

28

The direct mail Notice, utilized here, is the gold standard, and is consistent with notice programs approved by other courts. *See Stott v. Capital Financial Services*, 277 F.R.D. 316, 342, (N.D. Tex. 2011) (approving notice sent to all class members by first class mail); *Billittri v. Securities America, Inc.*, Nos. 3:09-cv-01568-F, 3:10-cv-01833-F, 2011 WL 3586217, *9 (N.D. Tex. Aug. 4, 2011) (same). The Notice adequately informed Settlement Class Members of the nature of the action, the definition of the class, the claims at issue, the ability of a class member to object or exclude themselves and/or enter an appearance through and attorney, and the binding effect of final approval and class judgment. The Notice utilized clear and concise language that is easy to understand and organized the Notice in a way that allowed Class Members to easily find any section that they may be looking for. Thus, it was substantively adequate. *See Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1202 (9th Cir. 2008), aff'd, 559 U.S. 260, 130 S. Ct. 1367, 176 L. Ed. 2d 158 (2010) ("The standard for what amounts to constitutionally adequate notice, however, is fairly low; it's 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection.'").

As outlined in detail in the Settlement Administrator's supporting declaration, the Notice Plan here, and its execution, satisfied all the requirements of Rule 23(c). On November 22, 2023, Epiq mailed 360,781 Postcard Notices via first-class mail. Azari Decl., ¶ 24. Robust efforts were made to determine forwarding addresses for returned mail, and to re-mail notices to good addresses. *Id.,* ¶¶ 35-36. After all re-mailings, Epiq reasonably believes that notice likely reached 336,043 of the 360,781 persons to whom the Postcard Notice was mailed, which equates to a reach rate of the direct mail notice of approximately 93.1%. *Id.,* ¶ 28. This reach exceeds other court-approved, best-practicable notice programs and Federal Judicial Center Guidelines, which state that a notice plan that reaches over 70% of targeted class members is considered a high percentage and the "norm" of a notice campaign. *Id.*

Also, the dedicated Settlement Website, www.PracticeMaxDataSettlement.com, "went live" on November 21, 2023. Azari Decl., ¶ 29. As of February 7, 2024, the Settlement Website

has received 46,203 page views. *Id.* Epiq established a toll-free telephone number for Settlement Class Members to call and obtain additional information about the Settlement through an Interactive Voice Response ("IVR") system. *Id.,* ¶ 30. As of February 7, 2024, the IVR system has received 487 calls. *Id.* As part of the Notice program, Epiq designated a post office box with the mailing address in order to receive Opt-Outs, Claim Forms, and correspondence from Settlement Class Members. *Id.,* ¶ 34.

Notice here was robust, effective, and met all due process requirements, as well as the requirements of Rule 23(c). This weighs in favor of final approval as well.

## VII.    CERTIFICATION OF THE SETTLEMENT CLASS

In the Preliminary Approval Order, the Court preliminarily certified the Settlement Class, finding that the Class satisfies all Rule 23 requirements. ECF No. 40. Nothing has changed since then that could conceivably undermine class certification. Accordingly, Plaintiffs respectfully request that the Court finally certify the Settlement Class for Settlement purposes.

## VIII.   CONCLUSION

Plaintiffs have negotiated a fair, adequate and reasonable Settlement that guarantees Settlement Class Members the opportunity to claim significant benefits. For the reasons discussed above, and for those described in Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 39) and Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards (ECF No. 42), Plaintiffs respectfully request this Court enter the proposed Final Approval Order, finally certify the Settlement Class, appoint Settlement Class Counsel and Plaintiffs as representatives for the Class, award Plaintiffs service awards in of $2,500 each, award Class Counsel combined attorneys' fees and litigation expense request of $825,000, and grant final approval of this Settlement.

Date: February 13, 2024

Respectfully Submitted,

*/s/ William B. Federman*
William B. Federman (*admitted Pro Hac Vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
T: (405) 235-1560
wbf@federmanlaw.com

**AUER RYAN, P.C.**
Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar #014637)
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
T: (520) 705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

**PEREZ LAW GROUP, PLLC**
Cristina Perez Hesano (#027023)
7508 N. 59th Avenue
Glendale, AZ 85301
T: (602) 730-7100
F: (623) 235-6173
cperez@perezlawgroup.com

**MURPHY LAW FIRM**
A. Brooke Murphy (*admitted Pro Hac Vice*)
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
T: (405) 389-4989
abm@murphylegalfirm.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger (*admitted Pro Hac Vice*)
221 West Monroe Street, Suite 2100
Chicago, IL 60606
T: 866.252.0878
gklinger@milberg.com

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MARKOVITS, STOCK & DEMARCO, LLC**
Terence R. Coates (*admitted Pro Hac Vice*)
Jonathan T. Deters (*admitted Pro Hac Vice*)
119 E. Court Street, Suite 530
Cincinnati, OH 45202
T: 513.651.3700
F: 513.665.0219
tcoates@msdlegal.com
jdeters@msdlegal.com

**TURKE & STRAUSS LLP**
Samuel J. Strauss (*admitted Pro Hac Vice*)
Raina C. Borrelli (*admitted Pro Hac Vice*)
613 Williamson St., Suite 201
Madison, WI 53703
T: (608) 237-1775
F: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION DIVISION**
John A. Yanchunis (*admitted Pro Hac Vice*)
Ryan Maxey (*admitted Pro Hac Vice*)
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: (813) 223-5505
jyanchunis@ForThePeople.com
rmaxey@ForThePeople.com

**THE LYON FIRM**
Joseph M. Lyon
2754 Erie Ave.
Cincinnati, Ohio 45208
T: (513) 381-2333
jlyon@thelyonfirm.com

*Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 13, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ William B. Federman*
William B. Federman
